COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-06-174-CR

ELPIDIO BERCERRIL APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 3 OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

In three points, appellant Elpidio Bercerril appeals his conviction and sentence for possession of 400 or more grams of cocaine with intent to deliver.
(footnote: 2)  We affirm.

BACKGROUND
 

On November 24, 2003, officers with the Fort Worth Police Department Narcotics Division
(footnote: 3) found Appellant, Gustavo Rodriguez, Jose Arevalo, and forty-three kilograms of cocaine, worth around $16,000 per kilogram, at a residence located at 4316 Goddard Street in Fort Worth.  The residence belonged to Rodriguez and had been under surveillance that day.  Eduardo Cantu, the target of the cocaine trafficking investigation, was arrested approximately fifteen minutes after he left the residence.  The police found three kilograms of cocaine
(footnote: 4) in his vehicle during a traffic stop.  Shortly after Cantu’s arrest, Sergeant Hall and Lieutenant Morgan acted to “freeze”
(footnote: 5) the residence while Officer Cedillo secured a search warrant for it.

Sergeant Hall testified that before approaching the house, he put on a bullet-proof vest and a black vest with “POLICE” in large letters on the back, over his plain clothes.  Neither Sergeant Hall nor Lieutenant Morgan wore masks, although some of the officers who subsequently joined them did.
(footnote: 6) Sergeant Hall testified that they went onto the property to see if it had any natural escape routes and approached a garage behind the residence when they heard metal-on-metal noises coming from it.  He stated that his concern was that the people inside “were either hiding or getting rid of the evidence.”  He testified that the garage door was open to a degree that he could see underneath it, and that he and Lieutenant Morgan raised the garage door and identified themselves as police.

Sergeant Hall testified that Appellant was standing next to the truck and appeared to be working on a toolbox in the back of the truck.  Appellant had a wrench in his hand.  Sergeant Hall said that the men appeared to be in the process of bolting the toolbox to the bed of the truck.  They ordered the three men to stop what they were doing and to wait in the corner of the garage, and they searched only after the search warrant was signed about an hour later.

Officer Martinez arrived to help with the search and found a flowered overnight bag near the garage door that contained “several kilos of cocaine,” in addition to an ice chest and two boxes on the floor, which also contained cocaine.  Sergeant Hall testified that the officers discovered that the pick-up truck had an altered gas tank with a trapdoor, lined with axle grease, which he testified is used to mask the odor of cocaine from drug-sniffing dogs.  Appellant demonstrated how to lift the toolbox from the truck using the garage hoist. When the toolbox was lifted, the altered fuel tank was revealed.

Officer Cedillo testified that when he arrived at the scene, he spoke to Appellant in Spanish and read Appellant his rights, and that Appellant understood them and agreed to waive them and talk with him.  Officer Cedillo testified that he was in plain clothes, but not wearing a mask, when he talked with Appellant.  Officer Cedillo questioned Appellant in the living room of the house.  He testified that they were alone in the living room but that there were several other officers in other parts of the house.  Appellant wrote a statement, consisting of one sentence in Spanish, which Cedillo translated as, “I was asked to help unload the truck and 5,000.”

Appellant pled not guilty.  He testified that Arevalo called him, asked him to do some mechanical work on his truck, picked Appellant up, and drove him to the residence.  Appellant testified that he checked the truck’s oil, cleaned its battery posts, and checked a headlight, and that he was just finishing his work when the police arrived.  He testified that an officer asked him for help with the hoist and that he “just g[a]ve him an option of how to do the things,” and that he did not volunteer to help.  He also testified that no one read him his 
Miranda
 rights on the statement sheet, but he admitted that his initials were by each of the rights and that he wrote them there.

Appellant explained that he wrote down the figure “5,000,” because he felt pressured by a masked officer to do so, although he acknowledged that the officer did not threaten him.  He testified that Officer Cedillo lied about not wearing a mask and he claimed that he did not know about the cocaine packages and had not seen them until they were shown in court.  Appellant also acknowledged at trial that he was a welder and owned welding equipment. Appellant denied knowing Arevalo before that day, other than seeing him twice in a bar, or that he knew Cantu or Rodriguez at all before that day.  His wife invoked her spousal privilege, and the State offered a transcript of her testimony at the bond hearing; the transcript was admitted into evidence.  In that transcript, she testified that she was friends with Rodriguez’s wife, knew Arevalo, and knew Cantu because he was one of Appellant’s friends.

The jury found Appellant guilty.  The trial court assessed thirty years’ confinement and a $5,000 fine as punishment and sentenced him accordingly. 

SUFFICIENCY OF THE EVIDENCE

In his first two points, Appellant challenges the legal and factual sufficiency of the evidence to show that he possessed or was affirmatively linked to the drugs.

Standard Of Review

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Hampton v. State
, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).  This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789.  The trier of fact is the sole judge of the weight and credibility of the evidence. 
 See
 
Tex. Code Crim. Proc. Ann. 
art. 38.04 (Vernon 1979); 
Margraves v. State
, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact-finder.  
Dewberry v. State
, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the evidence in favor of the verdict.  
Curry v. State
, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).  The sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case.  
Malik v. State
, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); 
Bowden v. State
, 166 S.W.3d 466, 470 (Tex. App.—Fort Worth 2005, pet. ref’d).

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party.  
Watson v. State
, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); 
Drichas v. State
, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005).  We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the fact-finder’s determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the fact-finder’s determination is manifestly unjust. 
 Watson
, 204 S.W.3d at 414-15, 417; 
Johnson v. State
, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).

In determining whether the evidence is factually insufficient to support a conviction that is nevertheless supported by legally sufficient evidence, it is not enough that this court “harbor a subjective level of reasonable doubt to overturn [the] conviction.”  
Id
.  We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury’s resolution of a conflict in the evidence.  
Id
.  We may not simply substitute our judgment for the fact-finder’s.  
Johnson
, 23 S.W.3d at 12; 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  Unless the record clearly reveals that a different result is appropriate, we must defer to the jury’s determination of the weight to be given contradictory testimonial evidence because resolution of the conflict “often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered.”  
Johnson
, 23 S.W.3d at 8.  Thus, we must give due deference to the fact-finder’s determinations, “particularly those determinations concerning the weight and credibility of the evidence.”  
Id
. at 9.

Affirmative Link

To support a conviction for unlawful possession of a controlled substance, the State must affirmatively link the accused to the contraband by proving that the accused (1) exercised control, management, or care over the contraband and (2) knew the substance he possessed was contraband.  
See 
Tex. Health & Safety Code Ann. 
§§ 481.002(38), 481.112(a);
 Poindexter v. State
, 153 S.W.3d 402, 405-06 (Tex. Crim. App. 2005); 
Brown v. State
, 911 S.W.2d 744, 747 (Tex. Crim. App. 1995)
.  Under the “affirmative links” rule, 

when the accused is not in exclusive possession of the place where the substance is found, it cannot be concluded that he had knowledge of and control over it unless there are additional independent facts and circumstances which affirmatively link him to the contraband.  
Poindexter
, 153 S.W.3d at 406.  That is, the evidence must establish, to the requisite level of confidence, that the accused’s connection with the drug was more than just fortuitous.  
Id. 
at
 405-406; 
Tucker v. State
, 183 S.W.3d 501, 510 (Tex. App.—Fort Worth 2005, no pet.).

Affirmative links can be proven by direct or circumstantial evidence.  
Brown
, 911 S.W.2d at 747.  Factors we consider include (1) Appellant’s presence when the search warrant was executed, (2) whether the drugs were in plain view, (3) Appellant’s proximity to and the accessibility of the drugs, (4) whether he was under the influence of narcotics when arrested, (5) whether he possessed other contraband or narcotics when arrested, (6) whether he made incriminating statements when arrested, (7) whether he attempted to flee, (8) whether he made furtive gestures, (9) whether there was an odor of the contraband, (10) whether other contraband or drug paraphernalia were present, (11) whether he owned or had the right to possess the place where the drugs were found, (12) whether the place where the drugs were found was enclosed, (13) whether he was found with a large amount of cash, and (14) whether his conduct indicated a consciousness of guilt.  
See Tucker
, 183 S.W.3d at 510. 

The State presented no evidence on factors (2), (4), (5), (7)-(9), (11), and (12).  However, the number of relevant factors is less significant than the logical force of the link they establish between the accused and the controlled substance.  
See Hudson v. State
, 128 S.W.3d 367, 374 (Tex. App.—Texarkana 2004, no pet.)
.  Affirmative links are established by the totality of the circumstances. 
 See Wootton v. State
, 132 S.W.3d 80, 87 (Tex. App.—Houston [14th Dist.] 2004, pet. ref’d).

Appellant argues that only his written statement hints at a tie to the altered pickup truck.  However, the evidence at trial showed that Appellant was present when the search warrant was executed.  The drugs were found in four different locations in the garage: a flowered overnight bag near the garage door, on the west side of the garage, an ice chest on the east wall of the garage, and in two boxes on the floor.  Appellant, who was standing next to the truck when Sergeant Hall and Lieutenant Morgan instituted the “freeze,” was essentially surrounded by contraband.  From Sergeant Hall’s testimony about the noise and seeing the men working on the toolbox, and Appellant’s admission that he is a welder, the jury could have inferred that Appellant had more than just a fortuitous link to the drugs.

Appellant made two incriminating statements—his written statement and the assistance he provided to the police in demonstrating how to use the hoist. Appellant disputed the voluntariness of both statements at trial, however, no motion to suppress was filed or suppression hearing held.  Appellant’s testimony—that when asked about the hoist, he just gave the officers an option on how to use it, and that he was not threatened to compel his statement —does not indicate that either action was actually involuntary.  As to other contraband or drug paraphernalia, the officers testified that the truck’s altered gas tank, which Appellant revealed by using the hoist to remove the toolbox, was a secret compartment that could be used for transporting drugs.

In deciding whether the evidence is sufficient to link a defendant to contraband, the trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given to their testimony.  
Poindexter
, 153 S.W.3d at 406.  The jury could have found Officer Cedillo, who testified that he read Appellant his rights in Spanish, that Appellant understood those rights, and that he was not wearing a mask when he talked with Appellant, more credible.  They could have chosen to believe, based on the evidence, that Appellant knew Rodriguez, Cantu, and Arevalo, and that he was hired not to perform mechanical work on the truck but to unload drugs from it.  Viewing this evidence in the light most favorable to the verdict and resolving any inconsistencies in its favor, we conclude that the jury could have found legally sufficient evidence of an affirmative link between Appellant and the cocaine.  
See Curry
, 30 S.W.3d at 406; 
see also Tucker
, 183 S.W.3d at 510-11 (holding that proximity and drugs in plain view were sufficient to establish affirmative link).  We overrule Appellant’s first point.

Viewing all the evidence in a neutral light, we also conclude that the evidence is not so weak that the jury’s determination was clearly wrong and manifestly unjust, or that a different result would have been appropriate.  The jury, considering all of the circumstances and evaluating the witnesses’ credibility and demeanor, could have found the officers’ testimony more credible than Appellant’s, supporting their finding that the evidence was factually sufficient to show an affirmative link between Appellant and the cocaine.  
See Watson
, 204 S.W.3d at 414-15, 417; 
Johnson
, 23 S.W.3d at 8.  We overrule Appellant’s second point.

JURY CHARGE

In his third point, Appellant complains that the trial court erred at the guilt-innocence phase by failing to instruct the jury, 
sua sponte
, that before it could use extraneous offense evidence against him, it had to first find beyond a reasonable doubt that he committed the offense.

Standard Of Review

Appellate review of error in a jury charge involves a two-step process.  
Abdnor v. State
, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994).  Initially, we must determine whether error occurred.  If so, we must then evaluate whether sufficient harm resulted from the error to require reversal.  
Id
. at 731-32.

Extraneous Offense

Appellant complains that the evidence that Cantu possessed three kilograms of cocaine when he was stopped for a traffic violation was an extraneous offense.  Appellant argues that he was harmed because there was no instruction “on how the jury should negotiate” that evidence and no evidence that Appellant was connected as a party to Cantu’s offense. Specifically, Appellant claims that because there was no evidence to connect him to Cantu’s acts, the admission of that evidence without a reasonable doubt instruction harmed him because it deprived and diminished his defense of mere presence alone, causing him to lose credibility before the jury.  The trial court did not err by failing to 
sua sponte 
give a reasonable doubt instruction on the alleged extraneous offense during the guilt-innocence phase.  
See Allen v. State
, 180 S.W.3d 260, 265-66 (Tex. App.—Fort Worth 2005, no pet.) (holding that a 
sua sponte 
reasonable doubt instruction on extraneous offenses is not required at guilt-innocence); 
compare Huizar v. State
, 12 S.W.3d 479, 484-85 (Tex. Crim. App. 2000) (op. on reh’g) (stating that failure to 
sua sponte 
give a reasonable doubt instruction at 
punishment
 regarding extraneous offense evidence is error subject to the 
Almanza 
harm analysis).  We overrule Appellant’s third point.  
See Abdnor
, 871 S.W.2d at 731.

CONCLUSION

Having overruled all of Appellant’s points, we affirm the trial court’s  judgment.

PER CURIAM

PANEL F:  HOLMAN, WALKER, and MCCOY, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED: 
 March 22, 2007

FOOTNOTES
1:
See
 
Tex. R. App. P.
 47.4.

2:
A person commits an offense if he knowingly possesses with intent to deliver a controlled substance listed in Penalty Group 1.  
Tex. Health & Safety Code Ann
. § 481.112(a) (Vernon 2003).  Penalty Group 1 includes cocaine.  
Id
. § 481.102(3)(D) (Vernon Supp. 2006).

3:
Sergeant Hall, Lieutenant Morgan, and Officers Cedillo, Martinez, De Los Santos, and Blaisdell were involved in the events of November 24, 2003.  Hall, Cedillo, Martinez, and Blaisdell testified at trial.

4:
The Narcotics Division had previously arranged an undercover drug deal with Cantu for three kilograms for November 24, 2003.

5:
According to testimony at trial, in a “freeze,” law enforcement officers approach a location and secure or detain any individuals at the location to prevent the destruction or removal of evidence pending the officers obtaining a search warrant.

6:
Officer Blaisdell testified that some of the Hispanic officers wore masks to prevent suspects from seeing their faces because of the likelihood of running into the same suspects “a year or two down the road.”  Sergeant Hall testified that masks are also worn because if the media arrived at the scene and photos of undercover officers were published, it could present a danger to them or jeopardize an investigation.